# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA

KYLE O'DONNELL, individually, and
on behalf of all others similarly situated,

      Plaintiff,

v.

SALESLOFT, INC., and APPFOLIO,
INC.,

      Defendants.

Case No.

**CLASS ACTION**

JURY DEMAND

## CLASS ACTION COMPLAINT

Plaintiff Kyle O'Donnell brings this Class Action Complaint against Defendants Salesloft, Inc. ("Salesloft") and AppFolio, Inc. ("AppFolio") (collectively, "Defendants"), and each of their present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, members, and/or other related entities, and upon personal knowledge as to his own actions, and information and belief as to all other matters, alleges as follows:

### INTRODUCTION

1.     This action arises out of the public exposure of the confidential, private information of thousands of individuals' personally identifying nformation[1] ("PII"),

---

[1] The Federal Trade Commission defines "identifying information" as "any name or

including of Plaintiff and the Class Members, which was in the possession of Defendants in a cyberattack on Salesloft systems and AppFolio's CRM system between August 8 to August 18, 2025, caused by Defendants' collective failures to adequately safeguard that Private Information ("the Data Breach").

2.    According to Defendants, the PII disclosed in the Data Breach includes names, addresses, dates of birth, and Social Security numbers (collectively, "Private Information").[2]

3.    Defendants failed to undertake adequate measures to safeguard the Private Information of Plaintiff and the proposed Class Members.

4.    As a direct and proximate result of Defendants' failures to protect current and former customers' sensitive Private Information and warn them promptly and fully about the Data Breach, Plaintiff and the proposed Class Members have suffered widespread injury and damages necessitating Plaintiff seeking relief on a class wide basis.

---

number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 17 C.F.R. § 248.201(b)(8). To be clear, according to Defendants, not every type of information included in that definition was compromised in the Data Breach.

[2] *See* Breach Letter, available at: https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/558113e2-5f95-4f04-ae80-27f404d3ac47.html.

**PARTIES**

5.     Plaintiff is a natural person and resident and citizen of Leon County, Florida, where he intends to remain. Plaintiff received a Notice Letter informing him that his Private Information was involved in the Data Breach.

6.     Defendant Salesloft is a Delaware corporation with a principal place of business in Atlanta, Georgia.

7.     Defendant AppFolio is a Delaware corporation with a principal place of business in Santa Barbara, California.

**JURISDICTION & VENUE**

8.     This Court has original jurisdiction over this action under the Class Action Fairness Act 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendants.

9.     This Court has personal jurisdiction over Defendant AppFolio because it continuously and systematically engages in business in this State, and because AppFolio has substantial contacts and activities within the State, from which Plaintiff's causes of action arise.

10.    This Court has personal jurisdiction over Defendant Salesloft because it is a Georgia citizen with its principal place of business in this state, and Salesloft continuously and systematically conducts business within the State.

11.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Salesloft's principal place of business is in this District and a substantial art of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## BACKGROUND FACTS

### A. Defendants Collect and Store Private Information as Part of Their Respective Businesses.

12.    Salesloft provides a revenue generation platform designed to help sales teams automate and manage the entire sales process.

13.    AppFolio a cloud-based software platform that offers comprehensive solutions for property management, helping real estate professionals and landlords manage their properties more efficiently.

14.    Salesloft is a service provider of AppFolio providing sales platforms for AppFolio, and was provided with Plaintiff's and Members' Private Information through this arrangement.

15.    AppFolio requires that its customers provide it with their Private Information, which AppFolio provides to Salesloft in connection with Salesloft providing its sales platform.

16.    Salesloft collects and stores Plaintiff's and the proposed Class Members' Private Information on its information technology computer systems, including but not limited to their names, addresses, dates of birth, and Social Security numbers.

17.    Despite their alleged commitments to securing sensitive data, Defendants do not follow industry standard practices in securing customers' Private Information and failed to protect the Private Information of Plaintiff and the proposed Class Members from unauthorized disclosure in the Data Breach.

**B. Defendants Failed to Safeguard Private Information, Causing the Data Breach.**

18.    On information and belief, according to Defendants, beginning on or around August 2025, Salesloft experienced a cyberattack to its computer information technology systems by an unauthorized actor, which resulted in the unauthorized disclosure and individuals' Private Information, including of Plaintiff and the proposed Class Members, including names, addresses, dates of birth, and Social Security numbers —i.e., the Data Breach.[3]

19.    On or about October 6, 2025, Defendants began sending written notice of the Data Breach ("Notice Letters") to affected individuals, including Plaintiff and Class Members.

_____

[3] *Id.*

5

20.     Defendants' conduct, by acts of commission or omission, caused the Data Breach, including: Salesloft's failures to implement best practices and comply with industry standards concerning computer system security to adequately safeguard Private Information, allowing Private Information to be accessed and stolen, and by failing to implement security measures that could have prevented, mitigated, or timely detected the Data Breach, and by failing to adequately train its employees on cybersecurity policies, enforce those policies, or maintain reasonable security practices and systems, resulting in the Data Breach; as well as AppFolio's failure to ensure its business associate Salesloft undertook these data security measures and appropriate employee training, prior to AppFolio providing Salesloft with Plaintiff's and the Class Members' Private Information.

21.     On information and belief, as more fully articulated below, Plaintiff and the members of the proposed Class Members' Private Information, was unauthorizedly disclosed to third-party cybercriminals in the Data Breach, has now or will imminently be posted to the Dark Web for public viewing and use, in the public domain, and/or utilized for criminal and fraudulent purposes and misuse.

**C. Plaintiff's Experience**

22.     Plaintiff is a customer of AppFolio.

23.     As a condition of receiving AppFolio's services, Plaintiff was required to provide his Private Information to AppFolio, including but not limited to

Plaintiff's name, address, date of birth, and Social Security number, which AppFolio then provided to Salesloft in connection with Salesloft's software services.

24.    Plaintiff typically takes measures to protect his Private Information and is very careful about sharing his Private Information. Plaintiff has never knowingly transmitted unprotected Private Information over the internet or other unsecured source. Plaintiff stores any documents containing his Private Information in a safe and secure location, and he diligently chooses unique usernames for his passwords and online accounts.

25.    In entrusting his Private Information to Defendants, Plaintiff believed that, as part of the services, Defendants would adequately safeguard that information. Had Plaintiff known that Salesloft did not utilize reasonable data security measures, and that AppFolio did not ensure Salesloft utilized reasonable data security measures, Plaintiff would not have entrusted his Private Information to Defendants, or would have paid less for the treatments and services he received.

26.    Plaintiff received a Notice Letter from Defendants informing him that his Private Information.

27.    As a direct and proximate result of the Data Breach permitted to occur by Defendants, Plaintiff has suffered, and imminently will suffer, injury-in-fact and damages, including the unauthorized disclosure of the Private Information itself, which, on information and belief due to the nature of the cyberattack, has been or

imminently will be used for criminal, fraudulent purposes and/or has been sold for such purposes and posted on the dark web; Plaintiff has been and will be forced to expend considerable time and effort to monitor his accounts and credit files, changing his online account passwords, verifying the legitimacy of the Data Breach Notice and researching the Data Breach, to protect himself from identity theft and fraudulent misuse of his Private Information, disclosed as a result of the Data Breach.

28.    In addition, as a result of the Data Breach, Plaintiff also suffered diminution in the value of his Private Information, a form of intangible property that he entrusted to Defendants.

29.    Furthermore, Plaintiff has been caused significant worry and feelings of anxiety and emotional distress regarding the disclosure of his Private Information in the Data Breach. Plaintiff fears for his personal financial security and uncertainty over the information disclosed in the Data Breach, and is experiencing emotional distress over the unauthorized disclosure of his Private Information. He is experiencing feelings of anxiety, stress, and fear because of the Data Breach.

30.    Plaintiff was highly disturbed by the Data Breach's nature and the thought of cybercriminals accessing his highly sensitive Private Information and the harm caused by the Data Breach.

31.    As a result of the Data Breach, Plaintiff faces a lifetime risk of identity theft, as his compromised Private Information includes sensitive information that cannot be changed.

32.    Furthermore, Plaintiff's sensitive Private Information remains in Defendants' possession without adequate protection against known threats, exposing Plaintiff to the prospect of additional harm.

**C.  This Data Breach was Foreseeable to Defendants.**

33.    Plaintiff and Class Members provided their Private Information to Defendants with the reasonable expectation and mutual understanding that Defendants would comply with their obligations to keep such information confidential and secure from unauthorized access.

34.    By failing to do so, Defendants put Plaintiff and Class Members at risk of identity theft, financial fraud, and other harms.

35.    Defendants tortiously, or in breach of their implied contracts, failed to take the necessary precautions required to safeguard and protect the Private Information of Plaintiff and the Class Members from unauthorized disclosure. Defendants' actions represent a flagrant disregard of Plaintiff's and the other Class Members' rights.

36.    Plaintiff and Class Members were the foreseeable and probable victims of Defendants' inadequate security practices and procedures. Defendants knew or

should have known of the inherent risks in collecting and storing Private Information and the critical importance of providing adequate security for that information.

37.     According to the Identity Theft Resource Center's January 24, 2022 report for 2021, "the overall number of data compromises (1,862) is up more than 68 percent compared to 2020. The new record number of data compromises is 23 percent over the previous all-time high (1,506) set in 2017. The number of data events that involved sensitive information (Ex: Social Security numbers) increased slightly compared to 2020 (83 percent vs. 80 percent)."[4]

38.     According to the ITRC's January 2023 report for 2022, "[t]he number of publicly reported data compromises in the U.S. totaled 1,802 in 2022. This represents the second highest number of data events in a single year and just 60 events short of matching 2021's all-time high number of data compromises."[5] In 2022, there were approximately 422 million individuals affected by cyberattacks.[6]

39.     Moreover, of the 1,802 data breaches in 2022, ITRC reported that 1,560 involved compromised names, 1,143 involved compromised of Social Security

---

[4] *See* "Identity Theft Resource Center's 2021 Annual Data Breach Report Sets New Record for Number of Compromises," Jan. 24, 2022, available at https://www.idtheftcenter.org/post/identity-theft-resource-center-2021-annual-data-breach-report-sets-new-record-for-number-of-compromises/ .

[5] Identity Theft Resource Center, 2022 Data Breach Report, available at https://www.idtheftcenter.org/wp-content/uploads/2023/01/ITRC_2022-Data-Breach-Report_Final-1.pdf, pg. 7.

[6] *See Id*., pg. 2.

Numbers, and 633 involved compromised dates of birth—types of Private Information included in the unauthorized disclosure in this Data Breach.[7]

40.    The increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendants' industry. According to IBM's 2022 report, "[f]or 83% of companies, it's not if a data breach will happen, but when."[8]

41.    Defendants were aware of the risk of data breaches because such breaches have dominated the headlines in recent years.

42.    Private Information is of great value to hackers and cybercriminals, and the data compromised in the Data Breach can be used for a variety of unlawful and nefarious purposes, including ransomware and fraudulent misuse, and sale on the Dark Web.

43.    Private Information can be used to distinguish, identify, or trace an individual's identity, such as their name, Social Security number, and medical records. This can be accomplished alone, or in combination with other personal or identifying information that is connected, or linked to an individual, such as their birthdate, birthplace, and mother's maiden name.

---

[7] *Id.*, pg. 6.
[8] IBM, "Cost of a data breach 2022: A million-dollar race to detect and respond," available at https://www.ibm.com/reports/data-breach.

44.     Given the nature of the Data Breach, it was foreseeable that the compromised Private Information could be used by hackers and cybercriminals in a variety of different injurious ways. Indeed, the cybercriminals who possess the Class Members' Private Information can easily obtain Class Members' tax returns or open fraudulent credit card accounts in the Class Members' names.

**D.  Defendants Failed to Comply with FTC Guidelines.**

45.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

46.     In 2016, the FTC updated its publication, *Protecting PII: A Guide for Business*, which establishes cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of PII that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the

system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[9]

47.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[10]

48.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

49.    These FTC enforcement actions include actions against healthcare providers failing to safeguard Private Information, such as Defendants. *See, e.g., In the Matter of LabMD, Inc., A Corp*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL

---

[9] *See* Federal Trade Commission, October 2016, "Protecting Private information: A Guide for Business," available at https://www.bulkorder.ftc.gov/system/files/publications/2_9-00006_716a_protectingpersinfo-508.pdf.
[10] *See id.*

13

4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

50.    Salesloft failed to properly implement basic data security practices widely known throughout the industry, and AppFolio failed to ensure its business associate, Salesloft, implemented these practices. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

**E. Defendants Failed to Comply with Industry Standards**

51.    As shown above, experts studying cyber security routinely identify organizations holding Private Information as being particularly vulnerable to cyber-attacks because of the value of the information they collect and maintain. As of 2022, ransomware breaches like that which occurred here had grown by 41% in the last year and cost on average $4.54 million dollars.[11]

52.    A number of industry and national best practices have been published and are widely used as a go-to resource when developing an institution's cybersecurity standards. The Center for Internet Security's (CIS) CIS Critical

---

[11] IBM, "Cost of a data breach 2022: A million-dollar race to detect and respond," available at https://www.ibm.com/reports/data-breach.

Security Controls (CSC) recommends certain best practices to adequately secure data and prevent cybersecurity attacks, including 18 Critical Security Controls of Inventory and Control of Enterprise Assets, Inventory and Control of Software Assets, Data Protection, Secure Configuration of Enterprise Assets and Software, Account Management, Access Control Management, Continuous Vulnerability Management, Audit Log Management, Email and Web Browser Protections, Malware Defenses, Data Recovery, Network Infrastructure Management, Network Monitoring and Defense, Security Awareness and Skills Training, Service Provider Management, Application Software Security, Incident Response Management, and Penetration Testing.[12]

53.    In addition, the National Institute of Standards and Technology (NIST) recommends certain practices to safeguard systems, *infra,* such as:

- Control who logs on to your network and uses your computers and other devices.

- Use security software to protect data.

- Encrypt sensitive data, at rest and in transit.

- Conduct regular backups of data.

---

[12] *See* https://www.rapid7.com/solutions/compliance/critical-controls/.

- Update security software regularly, automating those updates if possible.

- Have formal policies for safely disposing of electronic files and old devices.

- Train everyone who uses your computers, devices, and network about cybersecurity. You can help employees understand their personal risk in addition to their crucial role in the workplace.[13]

54.    Upon information and belief, Defendants failed to implement industry standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established frameworks for reasonable cybersecurity readiness, as well as failing to comply with other industry standards for protecting Plaintiffs' and Class Members' Private Information, resulting in the Data Breach.

---

[13] Understanding The NIST Cybersecurity Framework, https://www.ftc.gov/business-guidance/small-businesses/cybersecurity/nist-framework (last acc. Apr. 14, 2023).

**F. The Data Breach Caused Plaintiff and Class Members Injuries and Damages.**

55.     Plaintiff and Class Members have suffered injury and damages from the unauthorized disclosure of their Private Information in the Data Breach that can be directly traced to Salesloft's failure to adequately protect that Private Information, and AppFolio's failures to ensure Salesloft adequately protected that Private Information, that has occurred, is ongoing, and/or imminently will occur.

56.     As stated prior, in the Data Breach, unauthorized cybercriminals were able to access the Plaintiff's and the proposed Class Members' Private Information, which on information and belief is now being used or will imminently be used for fraudulent purposes and/or has been sold for such purposes and posted on the dark web for sale, causing widespread injury and damages.

57.     The ramifications of Defendants' failure to keep Plaintiff's and the Class's Private Information secure are severe. Identity theft occurs when someone uses another's personal and financial information such as that person's name, account number, Social Security number, driver's license number, date of birth, or other information, such as addresses, without permission, to commit fraud or other crimes.

58.     Because Defendants collectively failed to prevent the Data Breach, Plaintiff and the proposed Class Members have suffered, will imminently suffer, and will continue to suffer damages, including monetary losses, lost time, anxiety, and

emotional distress. Plaintiff and the Class Members have suffered, are at an increased risk of suffering, or will imminently suffer:

a.    exposure of that Private Information, including said information being posted on the dark web for fraudulent, criminal activity or sale;

b.    fraudulent misuse of Private Information, including fraudulent loans taken out using Private Information acquired in the Data Breach, fraudulent cellular telephone accounts taken out using Private Information acquired in the Data Breach; and, identity theft and impersonation using Private Information acquired in the Data Breach;

c.    Malware, and increase in spam emails;

d.    The loss of the opportunity to control how Private Information is used;

e.    The diminution in value of their Private Information;

f.    The compromise and continuing publication of their Private Information;

g.    Out-of-pocket expenses associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

h.    Lost opportunity costs and lost wages associated with the time and effort expended addressing and trying to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

i.    Emotional Distress;

j.    Delay in receipt of tax refund monies;

k.    Unauthorized use of stolen Private Information; and

l.    The continued risk to their Private Information, which remains in the possession of Defendants and is subject to further breaches so long as Salesloft fails to undertake the appropriate measures to protect the Private Information in its possession, and AppFolio to ensure Salesloft undertakes these measures.

59.    Furthermore, the Data Breach has placed Plaintiff and the proposed Class Members at an increased risk of fraud and identity theft.

60.    There are myriad dangers which affect victims of identity theft, including: cybercriminals opening new financial accounts, credit cards, and loans in victim's names; victim's losing health care benefits (medical identity theft); hackers taking over email and other accounts; time and effort to repair credit scores; losing home due to mortgage and deed fraud; theft of tax refunds; hackers posting

embarrassing posts on victim's social media accounts; victims spending large amounts of time and money to recover their identities; experiencing psychological harm and emotional distress; victims becoming further victimized by repeat instances of identity theft and fraud; cybercriminals committing crimes in victim's names; victims' personal data circulating the Dark Web forever; victims receiving increased spam telephone calls and emails; victims' children or elderly parents having their identities stolen.[14]

61.    The FTC recommends that identity theft victims take several costly steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, seeking a credit freeze, and correcting their credit reports.[15]

62.    The time-consuming process recommended by the FTC and other experts is complicated by the vulnerable situations of Defendants' customers.

---

[14] *See* Gaetano DiNardi, Aura.com, "How Bad Is Identity Theft? Is It Serious?" (December 14, 2022) available at https://www.aura.com/learn/dangers-of-identity-theft#:~:text=Fraudsters%20can%20open%20new%20accounts,to%20repair%20your%20credit%20score.
[15] *See* https://www.identitytheft.gov/Steps.

63.    Identity thieves use stolen Private Information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

64.    Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information.

65.    In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's Private Information to police during an arrest—resulting in an arrest warrant being issued in the victim's name. That can be even more problematic and difficult to remedy for someone who already has a criminal record.

66.    Further, according to the Identity Theft Resource Center's 2021 Consumer Aftermath Report, identity theft victims suffer "staggering" emotional tolls: For example, nearly 30% of victims have been the victim of a previous identity crime; an all-time high number of victims say they have contemplated suicide. Thirty-three percent reported not having enough money to pay for food and utilities,

while 14% were evicted because they couldn't pay rent or their mortgage.  Fifty-four

percent reported feelings of being violated. [16]

67.     What's more, theft of Private Information is also gravely serious outside

of the traditional risks of identity theft. In the last two decades, as more and more of

our lives become interconnected through the lens of massively complex cloud

computing, Private Information is a valuable property right.[17]

68.     The value of sensitive information is axiomatic; one need only consider

the value of Big Data in corporate America, or that the consequences of cyber theft

include heavy prison sentences. Even the obvious risk to reward analysis of

cybercrime illustrates beyond doubt that Private Information has considerable

market value.

69.     It must also be noted there may be a substantial time lag–measured in

years–between when harm occurs versus when it is discovered, and also between

when Private Information and/or financial information is stolen and when it is used.

---

[16] *See* Jason Steele, *Credit Card and ID Theft Statistics*, CreditCards.com (June 11, 2021), avail. at https://www.creditcards.com/statistics/credit-card-security-id-theft-fraud-statistics-1276/ citing Identity Theft Resource Center, "2021 Consumer Aftermath Report," May 26, 2021 available at https://www.idtheftcenter.org/post/the-identity-theft-resource-centers-2021-consumer-aftermath-report-reveals-impacts-on-covid-19-identity-crime-victims/.

[17] *See, e.g.*, John T. Soma, et al, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("Private information") Equals the "Value" of Financial Assets*, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("Private information, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

70.     Private Information and financial information are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

71.     Where the most Private Information belonging to Plaintiff and Class Members was accessible from Salesloft's network, there is a strong probability that entire batches of stolen information have been dumped on the black market and are yet to be dumped on the black market, meaning Plaintiff and the Class Members are at an increased risk of fraud and identity theft for many years into the future.

105.    Thus, Plaintiff and the Class Members must vigilantly monitor their financial and other accounts for many years to come.

106.    According to cybersecurity experts, "[r]eports show the value of a health record can be worth as much as $1,000, whereas on the dark web, a credit card number is worth $5 and Social Security numbers are worth $1."[18]

107.    Social Security numbers are among the worst kind of PII to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an

---

[18] Sanjay Cherian, Forbes Magazine, "Healthcare Data: The Perfect Storm," January 14, 2022, available at https://www.forbes.com/sites/forbestechcouncil/2022/01/14/healthcare-data-the-perfect-storm/?sh=28523ee56c88.

individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud.[19]

108.  For example, the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines. Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[20] Each of these fraudulent activities is difficult to detect. An individual may not know that his or his Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

109.  Moreover, it is not an easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to

---

[19] *See* U.S. Social Security Administration, "Identity Theft and Your Social Security Number," Publication No. 05-10064, July 2021, available at https://www.ssa.gov/pubs/EN-05-10064.pdf.
[20] *See id.*

link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[21]

110.    This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."[22]

111.    Accordingly, the Data Breach has caused Plaintiff and the proposed Class Members a greatly increased risk of identity theft and fraud, in addition to the other injuries and damages set forth herein, specifically the imminent identity fraud and criminal fraudulent activity; lost time and efforts in remediating the impact of the Data Breach, and other injury and damages as set forth in the preceding paragraphs.

112.    Defendants knew or should have known of these harms which would be caused by the Data Breach they permitted to occur, and Salesloft should have strengthened its data systems accordingly, and AppFolio should have ensured that

---

[21] *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR, Brian Naylor, Feb. 9, 2015, http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthems-hackers-has-millions-worrying-about-identity-theft.
[22] *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, Tim Greene, Feb. 6, 2015, http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

Salesloft did so before entrusting Plaintiff's and Class Members' Private Information to Salesloft.

## CLASS ACTION ALLEGATIONS

113.   Plaintiff brings this action on behalf of himself and on behalf of a proposed class of all other persons similarly situated, defined as follows:

> All individuals whose Private Information may have been involved in the Data Breach, including all individuals who received Notice Letters (the "Class").

114.   Excluded from the Class are Defendants' officers, directors, and employees; any entity in which Defendants have a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendants. Excluded also from the Class are members of the judiciary to whom this case is assigned, their families and Members of their staff.

115.   Plaintiff reserves the right to amend or modify the Class definitions as this case progresses.

116.   <u>Numerosity</u>. The Members of the Class are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time, based on information and belief, the Class consists of thousands of individuals whose sensitive data was compromised in the Data Breach.

117. <u>Commonality</u>. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

    a.    if Defendants unlawfully used, maintained, lost, or disclosed Plaintiff's and Class Members' Private Information;

    b.    if Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

    c.    if Defendants' data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

    d.    if Defendants' data security systems prior to and during the Data Breach were consistent with industry standards;

    e.    if Defendants owed a duty to Class Members to safeguard their Private Information;

    f.    if Defendants breached their duty to Class Members to safeguard their Private Information;

    g.    if Defendants knew or should have known that their data security systems and monitoring processes were deficient;

    h.    if Defendants should have discovered the Data Breach sooner;

i.    if Plaintiff and Class Members suffered legally cognizable damages as a result of Defendants' misconduct;

j.    if Defendants' conduct was negligent;

k.    if Defendants' breach implied contracts with Plaintiff and Class Members;

l.    if Defendants were unjustly enriched by unlawfully retaining a benefit conferred upon them by Plaintiff and Class Members;

m.    if Defendants failed to provide notice of the Data Breach in a timely manner, and;

n.    if Plaintiff and Class Members are entitled to damages, civil penalties, punitive damages, treble damages, and/or injunctive relief.

118.   <u>Typicality</u>. Plaintiff's claims are typical of those of other Class Members because Plaintiff's information, like that of every other Class Member, was compromised in the Data Breach.

119.   <u>Adequacy of Representation</u>. Plaintiff will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiff's Counsel are competent and experienced in litigating class actions.

120.   <u>Predominance</u>. Defendants have engaged in a common course of conduct toward Plaintiff and Class Members, in that all the Plaintiff's and Class Members' data was stored on the same computer system and unlawfully accessed in

the same way. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

121.   <u>Superiority</u>. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a Class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

122.   Defendants have acted on grounds that apply generally to the Class as a whole, so that Class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

123.   Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the

resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a.    if Defendants failed to timely notify the public of the Data Breach;

b.    if Defendants owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

c.    if Defendants' security measures to protect their data systems were reasonable in light of best practices recommended by data security experts;

d.    if Defendants' failure to institute adequate protective security measures amounted to negligence;

e.    if Defendants failed to take commercially reasonable steps to safeguard consumer Private Information; and

f.    if adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

124.   Finally, all members of the proposed Class are readily ascertainable. Defendants have access to Class Members' names and addresses affected by the Data

Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendants.

## COUNT I
## NEGLIGENCE
### (On Behalf of Plaintiff and the Class)

125. Plaintiff repeats and re-alleges paragraphs 1 through 124 and incorporates them by reference herein.

126. Plaintiff and the Class Members entrusted their Private Information to AppFolio, and other customers, who entrusted the Private Information to Salesloft to provide sales management software.

127. Defendants owed to Plaintiff and Class Members a duty to exercise reasonable care in handling and using the Private Information in their care and custody, including implementing industry-standard security procedures sufficient to reasonably protect the information from the Data Breach, theft, and unauthorized use that came to pass, and to promptly detect attempts at unauthorized access.

128. Further, AppFolio owed to Plaintiff a duty to exercise reasonable care in supervising Salesloft to ensure Salesloft adequately protected the Private Information which AppFolio had entrusted to Salesloft.

129. Defendants owed a duty of care to Plaintiff and Class Members because it was foreseeable that Defendants' failure to collectively adequately safeguard the Private Information in accordance with state-of-the-art industry standards

concerning data security would result in the compromise of that Private Information—just like the Data Breach that ultimately came to pass. Defendants acted with wanton and reckless disregard for the security and confidentiality of Plaintiff's and members of the Class's Private Information by disclosing and providing access to this information to third parties and by failing to properly supervise both the way the Private Information was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

130. Defendants owed to Plaintiff and Class Members a duty to notify them within a reasonable timeframe of any breach to the security of their Private Information. Defendants also owed a duty to timely and accurately disclose to Plaintiff and members of the Class the scope, nature, and occurrence of the Data Breach. This duty is required and necessary for Plaintiff and Class Members to take appropriate measures to protect their Private Information, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

131. Defendants owed these duties to Plaintiff and members of the Class because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendants knew or should have known would suffer injury-in-fact from said Defendants' inadequate security protocols. Defendants actively sought and obtained Plaintiff's and members of the Class's Private Information.

132.   The risk that unauthorized persons would attempt to gain access to the Private Information and misuse it was foreseeable. Given that Defendants collect and hold vast amounts of Private Information, it was inevitable that unauthorized individuals would attempt to access their databases containing the Private Information—whether by a sophisticated cyberattack or otherwise.

133.   Private Information is highly valuable, and Defendants knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the Private Information of Plaintiff and Class Members and the importance of exercising reasonable care in handling it, and of AppFolio in supervising Salesloft's handling of that information.

134.   Defendants breached their duties by failing to exercise reasonable care in supervising its agents, employees, contractors, vendors, and suppliers, and in handling and securing the Personally Information of Plaintiff and Class Members, and by AppFolio failing to ensure Salesloft did so, which actually and proximately caused the Data Breach and Plaintiff's and Class Members' injury-in-fact and damages.

135.   Defendants further breached their duties by failing to provide reasonably timely notice of the Data Breach to Plaintiff and members of the Class, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiff and Class Members' injuries-in-fact.

136.  As a direct, proximate, and traceable result of Defendants' negligence, Plaintiff has suffered or will imminently suffer injury-in-fact and damages, as set forth in the preceding paragraphs.

137.  Defendants' breach of their common-law duties to exercise reasonable care and their failures and negligence actually and proximately caused Plaintiff and Class Members actual, tangible, injury-in-fact and damages, including: exposure of that Private Information, including being posted on the Dark Web for fraudulent, criminal activity or sale; fraudulent misuse of Private Information including fraudulent loans, fraudulent cellular telephone accounts, and identity theft and impersonation using Private Information acquired in the Data Breach; malware, and increase in spam emails; loss of the opportunity to control how Private Information is used; diminution in value of their Private Information; compromise and continuing publication of their Private Information; out-of-pocket expenses associated with the prevention, detection, recovery, and remediation from identity theft or fraud; lost opportunity costs and lost wages associated with the time and effort expended addressing and trying to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud; emotional Distress; delay in receipt of tax refund monies; unauthorized use of stolen Private Information; the continued risk to their Private Information, which remains in the possession of

Defendants and is subject to further breaches so long as Salesloft fails to undertake the appropriate measures to protect the Private Information in its possession, and AppFolio fails to ensure Salesloft undertakes these measures; and, an increased risk of fraud and identity theft.

138.   As a result of the negligence of Defendants, Plaintiff and the Class Members are entitled to recover actual, compensatory, and punitive damages.

139.   Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to (i) properly notify affected victims of the Data Breach (ii) strengthen their data security systems and monitoring procedures; (iii) submit to future annual audits of those systems and monitoring procedures; and (iv) provide adequate credit monitoring to all Class Members.

140.   Unless and until enjoined, and restrained by order of this Court, Defendants' wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class Members in that the Private Information maintained by Defendants can be viewed, distributed, and used by unauthorized persons for years to come. Plaintiff and the Class Members have no adequate remedy at law for the injuries in that a judgment for monetary damages will not end the exposure of the Private Information of Plaintiff and the Class Members.

## COUNT II
## BREACH OF IMPLIED CONTRACT
### (On Behalf of Plaintiff and the Proposed Class)

141.   Plaintiff repeats and re-alleges paragraphs 1 through 124 and incorporates them by reference herein.

142.   Defendant AppFolio offered to provide real estate software/services to Plaintiff and the Class Members in exchange for their Private Information and in exchange for amounts paid for the software and/or services that included payment for data security.

143.   AppFolio entrusted the Private Information of Plaintiff and the proposed Class Members to Salesloft, their business associate, in order for Salesloft to provide software management services.

144.   Plaintiff and the Class Members accepted Defendant AppFolio's offer by providing Private Information to AppFolio, and in turn to Salesloft, in exchange for management services.

145.   In turn, and through internal policies described in the preceding paragraphs, and other conduct and representations, Defendants agreed they would not disclose the Private Information they collect to unauthorized persons and that they would safeguard customers' Private Information, including by Private Information supervising their business associate, Salesloft, to ensure it adequately safeguarded customers' Private Information.

146.   Implicit in the parties' agreement was that Defendants would provide Plaintiff and the Class Members with prompt and adequate notice of all unauthorized access and/or theft of their Private Information.

147.   Plaintiff and the Class Members would not have entrusted their Private Information to Defendants in the absence of such an agreement with AppFolio, and Salesloft.

148.   Defendants materially breached the contract(s) each had entered into with Plaintiff and the Class Members by failing to safeguard their Private Information, including by AppFolio failing to supervise Salesloft to ensure it properly safeguarded their Private Information, and by failing to notify them promptly of the Data Breach to Salesloft's computer systems that compromised such information. AppFolio further breached the implied contracts with Plaintiff and the Class Members by:

a.   Failing to properly safeguard and protect Plaintiff's and members of the Class's Private Information, including AppFolio failing to properly supervise Salesloft to ensure it safeguarded the Private Information entrusted to it;

b.   Failing to comply with industry standards as well as legal obligations that are necessarily incorporated into the parties' agreement; and

    c. Failing to ensure the confidentiality and integrity of electronic Private Information that Defendants created, received, maintained, and transmitted.

149. The damages sustained by Plaintiff and members of the Class as described above were the direct and proximate result of Defendants' material breaches of its agreement(s).

150. Plaintiff and the Class Members have performed as required under the relevant agreements, or such performance was waived by the conduct of Defendants.

151. The covenant of good faith and fair dealing is an element of every contract. All such contracts impose upon each party a duty of good faith and fair dealing. The parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

152. Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.

153.    Defendants failed to advise Plaintiff and members of the Class of the Data Breach promptly and sufficiently.

154.    In these and other ways, Defendants violated their duties of good faith and fair dealing.

155.    Plaintiff and the Class Members have sustained injury-in-fact and damages because of Defendants' breaches of their agreements, including breaches thereof through violations of the covenant of good faith and fair dealing.

156.    As a direct and proximate result of Defendants' breach of implied contract, Plaintiff and the proposed Class Members and are entitled to actual, compensatory, and consequential damages.

**COUNT III**
**BREACH OF THIRD-PARTY BENEFICIARY CONTRACT**
**(On Behalf of Plaintiff and the Class)**

157.    Plaintiff repeats and re-alleges paragraphs 1 through 124 and incorporates them by reference herein.

158.    Plaintiff and the proposed Class Members are third-party beneficiaries of contracts between Salesloft and AppFolio, and likely between Salesloft and other customers, under which Salesloft: received Plaintiff's and the Class's Private Information; stored that information in its computer network systems; and provided management services to their customers.

159.   Plaintiff and the proposed Class Members, as customers of AppFolio or other parties in contract with Salesloft, were the intended beneficiaries of these contracts, in that the contracts all related to the provision of services to Plaintiff and the Class.

160.   Defendants have breached the foregoing contracts by failing to adequately protect Plaintiff's and the Class Members' Private Information, resulting in the Data Breach, and injury-in-fact and damages.

161.   Each Defendant materially breached the contract(s) it entered into by failing to safeguard the Private Information entrusted to it, including by AppFolio failing to properly supervise Salesloft to ensure it safeguarded Plaintiff's and the Class's Private Information, and including breaches of the covenant of good faith and fair dealing.

162.   As a direct and proximate result, Plaintiff and Class Members suffered injuries and damages as set forth herein, and are entitled to actual, compensatory, and consequential damages in an amount to be proven at trial.

**COUNT IV**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class)**

163.   Plaintiff repeats and re-alleges paragraphs 1 through 124 of this Complaint and incorporates them by reference herein.

164.   Plaintiff and the Class Members conferred a benefit upon Defendants in the form of monies paid for real estate management software and services and by providing their Private Information to Defendants in order to receive such services.

165.   Defendants appreciated or had knowledge of the benefits conferred upon themselves by Plaintiff and the Class Members.

166.   As a result of Defendants' conduct, Plaintiff and members of the Class suffered actual damages in an amount equal to the difference in value between the purchases made with reasonable data privacy and security practices and procedures that Plaintiff and the Class Members paid for, and the purchases without unreasonable data privacy and security practices and procedures that they received.

167.   Under principles of equity and good conscience, Defendants should not be permitted to retain the full value of Plaintiff's and the proposed Class Members' payments and their Private Information because Defendants failed to adequately protect their Private Information, and because AppFolio failed to properly supervise Salesloft to ensure it protected Plaintiff's and the Class Members' Private Information. Plaintiff and the Class Members would not have provided their Private Information, nor used and paid for Defendants' services, had they known Defendants would not adequately protect their Private Information.

168.    Defendants should be compelled to disgorge into a common fund for the benefit of Plaintiff and members of the Class all unlawful or inequitable proceeds received by it because of its misconduct and the Data Breach alleged herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually, and on behalf of all others similarly situated individually, respectfully requests that the Court enter an order:

A.    Certifying this case as a class action on behalf of Plaintiff and the proposed Class, appointing Plaintiff as class representative, and appointing Plaintiff's counsel to represent the Class;

B.    Awarding Plaintiff and the Class damages that include applicable compensatory, actual, exemplary, and punitive damages, as allowed by law;

C.    Awarding restitution and damages to Plaintiff and the Class in an amount to be determined at trial;

D.    Awarding declaratory and other equitable relief as is necessary to protect the interests of Plaintiff and the Class;

E.    Awarding injunctive relief as is necessary to protect the interests of Plaintiff and the Class;

F.    Awarding attorneys' fees and costs, as allowed by law;

G.    Awarding prejudgment and post-judgment interest, as provided by law;

H.    Granting Plaintiff and the Class leave to amend this complaint to conform to the evidence produced at trial; and

I.    Granting such other or further relief as may be appropriate under the circumstances.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: October 14, 2025                Respectfully submitted,

*/s/ Casondra Turner*
Casondra Turner
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC**
260 Peachtree Street, NW
Suite 2200
Atlanta, GA 30303
Telephone: (866) 252-0878
Fax: (771) 772-3086
cturner@milberg.com

A. Brooke Murphy
(application for *pro hac vice* forthcoming)
**MURPHY LAW FIRM**
4116 Will Rogers Pkwy, Suite 700
Oklahoma City, OK 73108
T: (405) 389-4989
abm@murphylegalfirm.com

*Counsel for Plaintiff and the Proposed Class*